UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————x

DMITRY OKRAYNETS and TATANIA OKRAYNETS,

      Plaintiffs,

   -against-

METROPOLITAN TRANSPORTATION AUTHORITY,
MTA NEW YORK CITY TRANSIT, MTA CAPITAL
CONSTRUCTION COMPANY and NEW YORK CITY
TRANSIT AUTHORITY,

      Defendants.

——————————————————————x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5|21|08

06 Civ. 7910 (CM)(HBP)
08 Civ. 0127 (CM)

DECISION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' POST-TRIAL MOTION PURSUANT TO
FEDERAL RULES 59 AND 50(B)

McMahon, J.:

    After a trial on damages only, a jury awarded $44,706,444 to Dmitry Okraynets

("plaintiff") and his wife, Tatiana Okraynets (together, "plaintiffs"). Defendants now move,

under Federal Rules of Civil Procedure 59 and 50(b), for an order: (1) granting a new trial on all

damages, or in the alternative; (2) setting aside as excessive the jury's awards to Mr. Okraynets

for pain and suffering and to Mrs. Okraynets for loss of services and society, and granting a new

trial on those issues unless plaintiffs stipulate to the remittitur set by the Court; (3) setting aside

the jury's award for past and future fringe benefits as a matter of law; (4) setting aside as

excessive the jury's award for past and future lost wages and all future medical, personal and

household expenses, and granting a new trial on those issues unless plaintiffs stipulate to the

1

remittitur set by the Court; and (5) granting a collateral source hearing under N.Y. CIV. PRAC. LAW AND RULES ("C.P.L.R.") § 4545 and Article 50.

For the reasons that follow, defendants' motion for a new trial is granted on the issues of Mr. Okraynets' pain and suffering, Mrs. Okraynets' loss of services and society, and Mr. Okraynets' loss of future fringe benefits, unless plaintiffs stipulate within 30 days of the date of this decision to the reduced awards of $2,500,000 for Mr. Okraynets' past pain and suffering, $8,000,000 for Mr. Okraynets' future pain and suffering, $100,000 for Mrs. Okraynets' past loss of services and society, $650,000 for Mrs. Okraynets' future loss of services and society, and $3,730,000 for Mr. Okraynets' future lost fringe benefits. The Court also grants defendants' motion for a hearing to determine collateral source set-offs. Defendants' other requests for relief are denied.

## BACKGROUND

Prior to his injury, Dmitry Okraynets was a union carpenter. On August 24, 2006, while working on the South Ferry Terminal construction site, Mr. Okraynets was injured when the gang of Doka forms to which he was harnessed detached from the wall, and he fell – along with the heavy forms, which landed on top of him – from a height of at least nine feet. (Trial Transcript (hereinafter, "Tr.") at 33-34.) Plaintiff was wearing an approved safety harness when the gang of forms separated from the wall that was being constructed. As a result of the accident, plaintiff suffered a host of serious injuries, including paraplegia resulting from a burst fracture at vertebra T-12, and he is permanently confined to a wheelchair. (Tr. 34; Court Ex. 9.) Mr. Okraynets brought this diversity action under New York Labor Law § 240(1), seeking damages for pain and

2

suffering and economic loss, both past and future. Mrs. Okraynets brought a derivative action for

loss of services and society.

Defendants conceded liability before jury selection, and the Court held a jury trial on

damages from March 3–12, 2008. The jury rendered a verdict awarding damages for several

items, resulting in a total award of $44,706,444. The itemized awards are as follows:

| **Past Damages** | |
|---|---|
| Pain and suffering | $5,000,000 |
| Loss of wages | $129,150 |
| Loss of fringe benefits | $53,049 |
| Hospital/medical expenses | $498,376 (stipulation) |
| Loss of services/society | $1,000,000 (Tatiana Okraynets) |
| | |
| **Future Damages** | |
| Pain and suffering | $15,000,000 (over 39 years) |
| Loss of wages | $5,261,135 (over 30 years) |
| Loss of fringe benefits | $4,214,734 (over 30 years) |
| Medical care & treatment | $2,100,000 (over 39 years) |
| Medications | $1,000,000 (over 39 years) |
| Home health aide | $4,250,000 (over 39 years) |
| Home modifications, education, training, transportation expenses | $700,000 (over 39 years) |
| Adaptive equipment, personal care supplies | $1,500,000 (over 39 years) |
| Loss of services/society | $4,000,000 (over 39 years) (Tatiana Okraynets) |

### DISCUSSION

## I.    Defendants' Motion for a New Trial on All Damages

I will first address defendants' contentions that I should grant a new trial on all damages

under Rule 59 based on (I) the admission of testimony concerning the effect of plaintiff's injuries

3

on Tatiana Okraynets and her family; (ii) summation comments by plaintiffs' counsel; and (iii) the timing of the disclosures of the reports and opinions by Dr. Guy W. Fried, M.D., and Dr. Yuri Brosgol, M.D.

## *Legal Standard*

The Court has significant discretion in deciding whether to grant a Rule 59 motion for a new trial. *See, e.g.*, Amato v. City of Saratoga Springs, 170 F.3d 311, 314 (2d Cir. 1999). In determining whether to order a new trial under Rule 59, a district court may independently weigh the evidence. *See, e.g.*, Song v. Ives Labs., Inc., 957 F.2d 1041, 1047 (2d. Cir. 1992); Geressy v. Digital Equip. Corp., 980 F. Supp. 640, 646 (E.D.N.Y. 1997). A motion for a new trial "may be granted even if there is substantial evidence to support the jury's verdict." Song, 957 F.2d at 1047. A jury's verdict, however, should not be disturbed unless it is seriously erroneous: "The trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence . . . ; and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice." Bevevino v. Saydjari, 574 F.2d 676, 684 (2d Cir. 1978); *see also* Caruolo v. John Crane, Inc., 226 F.3d 46, 54 (2d Cir. 2000) (noting that courts exercise their discretion to grant a new trial if "the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice").

## A.    Testimony Concerning Mrs. Okraynets' Psychiatric Condition

During the trial, the jury heard testimony from Mrs. Okraynets' psychotherapist, Dr. Anna Krayn – as well as from Mrs. Okraynets herself – regarding the psychological impact of Dmitry

4

Okraynets' injuries upon his wife and family. This testimony was subsequently stricken from the

record by the Court when, at the close of plaintiffs' case, plaintiffs' counsel (Mr. Sacks) was

unable to provide any legal support for the claim that Mrs. Okraynets could collect damages,

derivatively, related to *her* psychological and emotional trauma as a result of her husband's

injuries. (*See* Tr. 581-83, 787-88.) The Court then gave the jurors a curative instruction that they

were not to consider any evidence related to this claim. (Tr. 805, 886-87.) My instruction to the

jury at the close of evidence was as follows:

> I need to tell you, and I will tell you again during the charge, that as
> a result of arguments that were made by the lawyers out of your
> hearing, I have concluded that certain testimony needs to be
> stricken. I am going to tell you now that I have stricken the
> testimony of Dr. Anna Krayn, Mrs. Okraynets' psychotherapist,
> and Mrs. Okraynets' own testimony about her emotional suffering,
> and you're to disregard that testimony as though it was never
> given.
>
> You're also to disregard any testimony that you heard from Mr.
> Welsch or from Dr. Schuster concerning expenses incurred or to be
> incurred by Mrs. Okraynets for her psychological or emotional
> injuries. I wanted to tell you that before the arguments.

(Tr. 805.)

I reiterated this instruction during the jury charge:

> Now, under the laws of the State of New York, Tatiana Okraynets'
> damages are limited to loss of services and society. Mrs.
> Okraynets may not receive damages for her own medical expenses,
> if any, or for her own physical or mental pain and suffering. As a
> result, I have stricken from the record the testimony of Dr. Anna
> Krayn, Mrs. Okraynets' psychotherapist, and Mrs. Okraynets' own
> testimony about her emotional suffering. I charge you to disregard
> that testimony. Do not consider it in any way as you award
> damages either to Mrs. Okraynets or to Mr. Okraynets. You should
> also disregard any testimony that you heard from Mr. Welsch or

5

> Dr. Schuster concerning expenses incurred or to be incurred by
> Mrs. Okraynets for her psychological or emotional injuries.

(Tr. 886-87.)

Defendants contend that a new trial is warranted because the Court's curative instructions to the jury to disregard the stricken testimony were insufficient to avoid unfair prejudice against defendants by the jury.

As the Second Circuit has observed, it must be presumed that juries are able to understand the court's instructions, and that juries follow these instructions. *See, e.g.*, Trademark Research Corp. v. Maxwell Online, Inc., 995 F.2d 326, 340 (2d Cir. 1993); United States v. Potamitis, 739 F.2d 784, 790 (2d Cir. 1984) (citation omitted). I have no reason to believe that the jury ignored or failed to understand the Court's curative instructions. Nor do I see why justice requires that a new trial be ordered as a result of the stricken testimony. Federal Rule 61 provides:

> *Unless justice requires otherwise*, no error in admitting or excluding evidence — or any other error by the court or a party — is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.

Fed. R. Civ. P. 61 (emphasis added).

In a civil case, an evidentiary error is harmless unless the party claiming error demonstrates that it is "likely that in some material respect the factfinder's judgment was swayed by the error." Tesser v. Board of Educ. of City Sch. Dist. of City of New York, 370 F.3d 314,

6

319 (2d Cir. 2004) (quotation and citation omitted). An erroneous evidentiary ruling that does not affect a party's "substantial right" is harmless. *See* id. "Whether an evidentiary error implicates a substantial right depends on the likelihood that the error affected the outcome of the case." Id. (quotation and citation omitted); *see also*, *e.g.*, Laguesse v. Storytown U.S.A., Inc., 296 A.D.2d 798, 801 (3rd Dep't 2002) (noting that statements admitted improperly were harmless because they were cumulative of other evidence presented at trial).

The jury received clear instructions that the testimony of Dr. Anna Krayn (and of Mrs. Okraynets herself) relating to Mrs. Okraynets' emotional and psychological suffering was to be stricken from the record and not to be considered in awarding damages. Nonetheless, defendants argue that the jury must have improperly considered the stricken testimony, given the large amount of damages it awarded to Mrs. Okraynets for loss of services and society.

The amount of damages awarded by the jury, in and of itself, does not demonstrate that the jury improperly considered evidence that was stricken from the record. The stricken testimony related to a specific, independent claim for costs of psychological treatment for Mrs. Okraynets— a claim that did not appear on the detailed, itemized verdict sheet. (*See* Court Ex. 14.) The exhibit containing the economic tables prepared by plaintiff's expert Donald Welsch was redacted so that, when the exhibit was sent back with the jury, it did not contain the calculations relating to the costs of Mrs. Okraynets' psychological treatment. (*See* PX 47 at 10; Tr. 893-94, 896-97.)

7

The jury's behavior does not suggest that the jurors ignored the Court's clear instructions. The jury did not accept the plaintiffs' evidence wholesale in order to render a quick verdict. It deliberated for more than six hours over the course of two days, and it awarded less for some items than the plaintiff's economist projected. In Marcoux v. Farm Service and Supplies, Inc., 290 F. Supp. 2d 457 (S.D.N.Y. 2003), the court noted that, even though the jury returned its verdict in two-and-a-half hours – which might weigh in favor of defendants' prejudice argument – the questions asked of the Court by the jury during deliberations demonstrated that the verdict was the product of careful consideration, rather than passion or prejudice. Id. at 473 n.9. The jury in this case deliberated for nearly three times as long as the jury in Marcoux, and its questions during deliberation also evince thorough consideration of the evidence. (See Court Exs. 10, 11.)

There was nothing objectionable (or objected to) in the Court's charge about Mrs. Okraynets' claim for loss of services and society.[1] The jurors were told what factors they could

---

[1] The relevant portions of the Court's instruction to the jury on Mrs. Okraynets' claim for loss of services and society are as follows:

'Services and society' is a technical term, so please follow these instructions carefully.
* * *

[Y]ou may take into account the nature and extent of Dmitry Okraynets' services and society before the injury, including his disposition, temperament, character and attainments[;] the interest he showed in his home, the social life of his family and in the comfort, happiness, education and general welfare of the members of his family[;] [t]he services he rendered in superintending the household, training the children and assisting his spouse in the management of the business or affairs of his spouse was engaged, if any[;] and his acts of affection, love and sexual intercourse. Then you will consider the extent to which the injuries he sustained prevent him from performing such services and providing such society.
* * *

You will award Tatiana Okraynets such an amount based upon the evidence and your own observation, your experience, knowledge, conscientiously applied to the facts and circumstances as in your judgment will compensate her for the pecuniary loss that you

8

consider in awarding damages on this claim. The cost of psychological treatment for Mrs.

Okraynets was not one of the factors mentioned to the jury. (Tr. 884-87.)

In view of the Court's curative instructions and the conjectural character of defendants'

arguments on this issue, defendants' motion for a new trial on this ground is denied. *Cf.* Tesser,

370 F.3d at 320; Costantino v. David M. Herzog, M.D., P.C., 203 F.3d 164, 174 (2d Cir. 2000).

## B.    Claim that Plaintiffs' Counsel's Summation Irreparably Prejudiced Defendants

Defendants also move for a new trial on the basis that Mr. Sacks's summation tainted the

jury and irreparably prejudiced defendants.

In ruling on such a motion, the key inquiry is whether counsel's conduct "created undue

prejudice or passion which played upon the sympathy of the jury." Strobl v. New York

Mercantile Exch., 582 F. Supp. 770, 780 (S.D.N.Y. 1984); *accord* Smith v. Nat'l R.R. Pass.

Corp., 856 F.2d 467, 470 (2d Cir. 1988); Marcoux, 290 F. Supp. 2d at 463. With regard to this

determination, "[g]reat discretion is to be given the judge who was present throughout the trial

find she has sustained and is reasonably certain to sustain in the future by reason of her
spouse's inability to perform such services and provide such society as a result of his
injuries.

\* \* \*

*Now, under the laws of the State of New York, Tatiana Okraynets' damages are limited
to loss of services and society. Mrs. Okraynets may not receive damages for her own
medical expenses, if any, or for her own physical or mental pain and suffering. As a
result, I have stricken from the record the testimony of Dr. Anna Krayn, Mrs. Okraynets'
psychotherapist, and Mrs. Okraynets' own testimony about her emotional suffering. I
charge you to disregard that testimony. Do not consider it in any way as you award
damages either to Mrs. Okraynets or to Mr. Okraynets. You should also disregard any
testimony that you heard from Mr. Welsch or Dr. Schuster concerning expenses incurred
or to be incurred by Mrs. Okraynets for her psychological or emotional injuries.*

(Tr. 884-87 (emphasis added).)

9

and is best able to determine the effect of the conduct of counsel on the jury." Johnson v. Celotex Corp., 899 F.2d 1281, 1289 (2d Cir. 1990); *see also* Matthews v. CTI Container Transport Int'l, Inc., 871 F.2d 270, 278 (2d Cir.1989)

The Second Circuit has remarked that "not all misconduct of counsel taints a verdict to such a degree as to warrant a new trial." Pappas v. Middle Earth Condominium Ass'n, 963 F.2d 534, 540 (2d Cir.1992). The trial court must view claims of attorney misconduct on a case-by-case basis, in the context of the trial as a whole, examining, among other things, the "[t]otality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, [and] the manner in which the parties and the court treated the comments . . . ." Hynes v. LaBoy, 887 F. Supp. 618, 632 (S.D.N.Y. 1995) (quoting City of Cleveland v. Peter Kiewit Sons' Co., 624 F.2d 749, 756 (6th Cir. 1980)). As long as prejudice does not result, "[i]n arguing to a jury, counsel must properly have some latitude . . . ." Schwartz v. Northwest Airlines, Inc., 275 F.2d 846, 846 (2d Cir. 1960); *accord* United States v. Richter, 826 F.2d 206, 209 (2d Cir. 1987).

Defendants attack the summation comments by plaintiffs' counsel on four grounds, which are discussed below. When viewed under the totality of the circumstances, and in the context of the trial as a whole, *see* Hynes, *supra*, it is clear that the alleged attorney misconduct in this case did not create such prejudice with the jury so as to warrant a new trial.

10

### 1.    Defendants' "Resources"

The first ground on which defendants claim prejudice is the statement by plaintiffs'

counsel that defendants "certainly had the resources" to call Dmitry Okraynets' treating doctors

to testify, "yet they didn't" do so. (Tr. 839.) Defendants argue that this comment about

"resources" suggested to the jury that defendants have "deep pockets" (i.e., that defendants could

satisfy a large judgment), and that a new trial should be granted for having made such a

suggestion.

When examined in context of the comments that preceded it, however, it is apparent that

this statement by Mr. Sacks referred to the equal ability of the defendants to subpoena a witness

to testify at trial:

> Now, I don't know why [Dr. Fried] was a bad choice, according to
> the defense, to present the overall picture of Mr. Okraynets'
> physical condition, but the defense had equal access to every single
> treating doctor, and if there was anything that could be gained by
> calling one of those physicians and prolonging the length of this
> case with more and more witnesses that was not already contained
> in those binders, they had the power and they certainly had the
> resources to do so, and yet they didn't.

(Tr. 839.)

During the entire trial – including the summation – plaintiffs' counsel never referred to

defendants' ability to satisfy a judgment, nor did he indicate that defendants are, or are associated

with, a large government entity. Indeed, the parties and the Court took great pains to remove

from the record any reference to "The City of New York," which was previously a defendant in

this action. (*See, e.g.*, Tr. 461-62.)

11

## *2.    Testimony of Dr. Goldman*

Defendants also claim prejudice because plaintiffs' counsel said, during summation, that defendants' economist, Dr. Goldman, was "trying to do harm to Mr. Okraynets' future life by underestimating his losses." (Tr. 846-47.) In essence, defendants argue that Mr. Sacks's statement about Dr. Goldman was improper because it was a pejorative characterization of one of defendants' witnesses and was intended to inflame the jury's passions.

During his summation, Mr. Sacks was trying to make the point that Dr. Goldman's direct testimony was crafted to "purposefully" avoid any discussion of his projection of over $2 million in future fringe benefits to Mr. Okraynets. (*See* Tr. 845.) Indeed, under cross-examination by Mr. Sacks, Dr. Goldman admitted that during his direct examination, he failed to mention at least $2 million of plaintiff's damages, because he was not specifically asked about them by defense counsel. (Tr. 714-16.) Immediately prior to making the statement at issue, Mr. Sacks told the jury that Dr. Goldman's direct testimony suggested that the jury should give Mr. Okraynets nothing for future fringe benefits, because of Dr. Goldman's "if you don't ask me, I won't tell you" approach. (*See* Tr. 846.)

Mr. Sacks then made the statement at issue, which in context reads: "What kind of witness who is supposedly in this very, very serious event, in [t]his very serious process that is trying to predict the future based on the pa[s]t would come here and make a statement like that if they weren't in fact, trying to do harm to Mr. Okraynets' future life by underestimating his losses." (Tr. 846-47.)  Although the statement was perhaps a bit abrasive, it was more a

12

reflection of Mr. Sacks's zealous advocacy than an unwarranted pejorative attack on defendants' economist.

When plaintiff's counsel's comments are viewed in context, it is clear that he merely sought to discredit defendants' economist during summation, which he is entitled to do. Mr. D'Avanzo did not object to the comment at the time, nor did he move to have it stricken from the record immediately following summations. Defendants have not demonstrated that this comment about Dr. Goldman caused undue prejudice to defendants.

### 3. *Vouching for Dr. Fried*

Yet another claim of prejudice by defendants is that Mr. Sacks improperly vouched for plaintiffs' expert, Dr. Fried, during summation by stating to the jury: "We brought to you, I believe, a highly trained individual with the training, experience and expertise . . . ." (Tr. 849.)

Dr. Fried's qualifications as the Chief Medical Officer of the McGee Spinal Rehabilitation Center were not called into question by defendants during the trial. Although an attorney's personal beliefs are not evidence to be considered by a jury, the mere fact that an attorney might have used the phrase "I believe" in his summation does not constitute impropriety. *See* Marcoux, 290 F. Supp. 2d at 468 ("We conclude that although plaintiff's counsel's use of language such as 'I suggest' and 'I don't believe' may have been inartful, his arguments did not rise to the level of vouching and injection of attorney credibility and personal belief . . . .") This Court has seen enough summations to know that such phrases are commonly

used, which is why I always anticipate the issue and instruct the jury prior to summation as

follows:

> We don't care about what anybody thinks except the eight of you.
> However, it is a common way of speaking in English that we begin
> sentences with place holders like "I think," and if a lawyer says
> that, what he means is, "I'm submitting the following idea for you
> to consider." That is a very cumbersome way of saying something.
> Remember that the lawyers' thoughts or personal beliefs are of no
> relevance here. It is only the evidence that is relevant and your
> thoughts and beliefs about it.

(Tr. 803-04.)

As far as the Court is concerned, defendants' complaint about this aspect of Mr. Sacks's

summation is a non-issue.

### 4.   *"Golden Rule" claims*

Finally, defendants assert that plaintiffs' counsel "egregiously invok[ed] the 'golden

rule'" during his summation. (Dkt. #66, Defs.' Mem. at 7.) The relevant passage, in context and

in its entirety,[2] reads as follows:

> [MR. SACKS:] I didn't hear one piece of evidence from the
> defense that contradicts he has accidents and he falls. Dmitry tried,
> and Dr. Fried tried to explain to you, and if you sit back when
> you're deliberating and just think about what it would be like to try
> to do things, any simple chores involving your legs if they don't
> move. Not only won't they move, gravity will make them move,
> they'll flop. Think about trying to put your socks on from a laying
> down position because remember he can't lean forward like we do
> to reach down to our feet because he'll fall over. He doesn't have
> frontal stability. Think abut trying to wrestle your pants on if your
> legs are flat on the bed. How long did it take each of you to put on
> a pair of pants? Dmitry said on a good day, there are good days
> and there are bad days, but sometimes by the time he is just putting

---

[2] Defendants' brief omits the first sentence-and-a-half and the last sentence.

14

>           on his pants, he is exhausted and he has to rest before he goes on to
>           the next phase of his routine.

(Tr. 850-52.)

Defendants correctly point out that it is error for counsel to ask jurors to render a verdict that they themselves would wish to receive if they were in the plaintiff's position. *See, e.g.*, Boshnakov v. Bd. of Educ. of Town of Eden, 277 A.D.2d 996, 996, 716 N.Y.S.2d 520 (4th Dep't 2000). However, in the cases cited by defendants, the error was that jurors were asked to award what *they would want to receive for damages* if they were in the plaintiff's position. In this case, the jurors were simply asked to think about the difference between how they perform everyday tasks and how plaintiff has to perform them. This is a perfectly legitimate way to get jurors to comprehend the gravity of a plaintiff's injuries.

Judge Conner's opinion in Marcoux, *supra*, is instructive. Judge Conner explained that the "Golden Rule," otherwise known as the "bag of gold" rule, prohibits counsel from "'tell[ing] the jurors, either directly or by implication, that they should put themselves in plaintiff's place and render such a verdict as they would wish to receive were they in plaintiff's position.'" Marcoux, 290 F. Supp. 2d at 463 (quoting Boshnakov, 277 A.D.2d at 996, 716 N.Y.S.2d at 520). Such comments by counsel are forbidden because they "'encourage[ ] the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence.'" Id. (quoting Forrestal v. Magendantz, 848 F.2d 303, 309 (1st Cir. 1988) (internal quotation marks omitted)).

15

In <u>Marcoux</u>, the plaintiff was injured in an automobile accident. Defendants asserted that plaintiff's counsel violated the "Golden Rule" twelve times during his summation, because he asked the jurors to "imagine" or "think" how the plaintiff's injury must have felt. 290 F. Supp. 2d at 463-65. Plaintiff's counsel asked the jury such questions as: "[C]ould you imagine how [plaintiff] felt as she was sitting there . . . while they're cutting her out with the Jaws of Life?"; "Can you imagine if you broke your wrist like this and had to have it put back together with plates and screws, what that must have been like?"; and "Do you think that, after a while, you might develop some pain up in your hip if you had a fracture like this?" <u>Id.</u>

Judge Conner concluded that these remarks "did not violate the 'Golden Rule' prohibition because they invited the jury to focus on the gravity of plaintiff's injuries, but did not tell the jurors directly or implicitly that they should award plaintiff the sum of damages that they themselves would desire if they found themselves 'in the plaintiff's shoes.'" <u>Id.</u> at 465.

In reaching this conclusion, Judge Conner cited a decision by the Delaware Supreme Court, <u>McNally v. Eckman</u>, 466 A.2d 363 (Del. 1983), in which the plaintiff was rendered a paraplegic—like Mr. Okraynets in this case—and plaintiff's counsel asked the jurors to imagine how it would feel to suffer from plaintiff's injuries and indignities. For example, plaintiff's counsel in that case asked the jury: "Suppose you had only to do with wasted, useless legs? What would you do?" <u>McNally</u>, 466 A.2d at 372 (cited in <u>Marcoux</u>, 290 F. Supp. 2d at 465 n.4). The Delaware Supreme Court found that these comments did not violate the "Golden Rule" because they asked the jury to focus on both the nature of the injuries involved and on the claim for damages and lost earnings, but did not ask the jurors to render a verdict that they, themselves,

16

would want to receive. *See* id. Judge Conner relied upon the McNally decision and reached the same conclusion because the comments in the two cases were "closely similar." Marcoux, 290 F. Supp. 2d at 466.

The summations in Marcoux and McNally are different from the ones in cases like Weintraub v. Zabotinsky – cited by defendants – where plaintiff's counsel asked jurors to compensate plaintiff "in such amounts as you jurors feel you, yourselves, would like to be compensated if the conditions happened to you the same as happened to [plaintiff]." 19 A.D.2d 906, 244 N.Y.S.2d 905 (2d Dep't 1963); *cf. also* Callaghan v. A Lague Express, 298 F.2d 349, 350-51 (2d Cir. 1962) (concluding that counsel cannot ask the jury to "treat [plaintiff] as you would like to be treated"); Klotz v. Sears, Roebuck & Co., 267 F.2d 53, 54-55 (7th Cir. 1959) (plaintiff's counsel asked jury to "give us the kind of deal that you would want to get").

The comments by Mr. Sacks closely resemble the permissible comments by counsel in Marcoux, and are entirely distinct from the improper comments in the cases cited by defendants. Mr. Sacks was not asking the jurors to award Mr. Okraynets what they themselves would want to receive if they suffered the same injuries; rather, Mr. Sacks endeavored to provide the jurors with a means of understanding the gravity of plaintiff's injuries. I endorse the reasoning of Judge Conner in Marcoux and conclude that Mr. Sacks did not violate the "Golden Rule" during his summation.[3]

---

[3] The Marcoux decision acknowledged that some other courts – such as the Fifth Circuit – view the Golden Rule differently. *See* 290 F. Supp. 2d at 466 n.5. However, this Court agrees with Judge Conner that the approach in Marcoux (and in McNally) is "more compatible" with Second Circuit precedent stating that attorneys are to be given substantial latitude in formulating their closing arguments. See id. (citing Reilly v. Natwest Markets Group, Inc., 181 F.3d 253, 271 (2d Cir. 1999), and United States v. Richter, 826 F.2d 206, 209 (2d Cir. 1987)).

17

## C.      Timing of the Disclosure of Reports and Opinions of Dr. Fried and Dr. Brosgol

Defendants also contend that prejudice resulted from the timing of two expert disclosures: the February 26, 2008, report of Dr. Brosgol, and the supplemental expert report of Dr. Fried.

Dr. Fried was plaintiffs' medical expert who testified at trial. Numerous physicians treated and covered Mr. Okraynets, so plaintiffs provided Dr. Fried with the records from the various treating doctors, and Dr. Fried then prepared a report based on the records he reviewed. (*See, e.g.*, Tr. 5, 385.) Dr. Brosgol was one of the physicians on whose reports Dr. Fried relied. (Tr. 396.)

Dr. Brosgol updated his findings just before trial. (*See* PX 50 at 25; Dkt. #65, Ex. A.) His additional findings related to a condition called a "syrinx" (i.e., a cyst within the spinal cord), which resulted from the injuries Mr. Okraynets suffered in the accident. *See* id. Originally, Dr. Brosgol thought the syrinx was asymptomatic, and did not think it would likely cause plaintiff any additional problems. (*See* Tr. 397.) Shortly before trial he changed his opinion, after plaintiff began to experience symptoms of degeneration. (*See* Tr. 412-13.) The existence of the syrinx was not disputed by defendants' medical expert, Dr. Jay Weiss, M.D. (Tr. 557), and its degeneration was a last-minute development (*see* Tr. 402.).

At trial, defendants objected to this change in diagnosis by plaintiff's medical expert, arguing that the late disclosure precluded the defendants from mounting a proper and complete defense. (Tr. 2-7, 793-96.) The Court addressed defendants' objection during trial, noting that

18

these expert reports were not prejudicial late disclosures, but rather attempts to document the

ongoing development of Mr. Okraynets' condition, which was inherently dynamic, not static.

This conclusion is reflected in the transcript:

> THE COURT: I have to tell you something, folks. I really do. I
> really do. This surfaced at the end of February, and I was asked for
> a continuance of the trial, and there was absolutely no need for a
> continuance of the trial .... If I had been asked to have a day for
> physical examination, I would have granted it, but I wasn't asked
> that. I was asked to have the trial continued.
>
> MR. D'AVANZO: And I asked for a deposition of Dr. Brosgol,
> because that was really the prejudicial part was that Dr. Brosgol, on
> the Friday before jury selection, now all of a sudden . . . comes out
> with an opinion contrary to his two prior evaluations . . . .
>                                 * * *
> THE COURT: Don't need a deposition. Subpoena him; bring him
> in here; and ask him questions in front of the jury.
>                                 * * *
> THE COURT: [T]his man's condition is going to develop over the
> course of the next however many years he has. I could have this
> trial this month, I could have this trial in six months, I could have
> this trial in six years, and there is no guarantee whatsoever that the
> week before the trial they wouldn't find some further deterioration
> or some unexpected improvement in his condition. We pick a
> moment for the trial and we do it.

(Tr. 793-95.)

Dr. Brosgol's "report" – which is really a letter to the Worker's Compensation Board (*see*

PX 50 at 25; Tr. 579; Dkt. #65, Ex. A) – was prepared as part of the continuing process of

treating Mr. Okraynets' dynamic condition. Dr. Brosgol had evaluated Mr. Okraynets'

complaints of numbness in his arms and hands in November 2007, and in December 2007 he

diagnosed plaintiff with a "cape distribution" of hot and cold sensation in his arms and hands–- a

change in his condition. (*See* PX 50 at 16.) In his February letter to the Worker's Compensation

Board, Dr. Brosgol opines that the manifestations of the syrinx condition have a "progressive

tendency," which, as Dr. Fried testified, could eventually result in quadriplegia. (*See* PX 50 at 25;

Dkt. #65, Ex. A; Tr. 379, 386-89.)

As for the supplemental report of Dr. Fried, dated February 26, 2008: this report was

served by plaintiffs pursuant to their obligation to supplement expert reports under Rule

26(a)(2)(D) of the Federal Rules of Civil Procedure. The supplemental report did not raise new

issues— it provided clarification of a previous report received by defendants. (*See* Dkt. #65, Ex.

A.)

I noted at trial that the information contained in the two expert reports that were served

shortly before trial constitute prime material for "cross [examination] and good jury argument"

by defendants, but found no prejudice resulting from the updated reports. (*See* Tr. 7.) I reaffirm

that ruling now. The opinions of the defendants' experts, which contradicted plaintiffs' experts,

were before the jury for consideration. Defendants had a full opportunity to cross examine Dr.

Fried. They could have had plaintiff reexamined by their physician; they could have called Dr.

Brosgol to the stand to undermine Dr. Fried's opinion (which relied on Dr. Brosgol's). The jury

received clear instructions about how to weigh expert testimony. (Tr. 877-78.)

## II.    Review of the Jury's Awards to Mr. Okraynets for Pain and Suffering, and to Mrs. Okraynets for Loss of Services and Society

### *Legal Standard*

Defendants ask the Court to set aside the jury's awards for pain and suffering, and for loss

of services and society, under C.P.L.R. § 5501( c ) as deviating materially from reasonable

20

compensation, and to grant a new trial on these issues unless plaintiffs stipulate to an appropriate
and substantial reduction.

According to the Second Circuit, a trial judge can grant a new trial, conditioned on
plaintiff's refusal to agree to remittitur, "in at least two distinct kinds of cases: (1) where the
court can identify an error that caused the jury to include in the verdict a quantifiable amount that
should be stricken," and "(2) more generally, where the award is 'intrinsically excessive' in the
sense of being greater than the amount a reasonable jury could have awarded, although the
surplus cannot be ascribed to a particular, quantifiable error." Kirsch v. Fleet Street, Ltd., 148
F.3d 149, 165 (2d Cir. 1998) (internal quotations omitted). A trial court must be careful not to
disturb a jury's award unless it is excessive, because calculation of damages is the province of
the jury, and damages need not be proved with mathematical certainty. *See, e.g.*, Sir Speedy, Inc.
v. L & P Graphics, Inc., 957 F.2d 1033, 1038 (2d Cir. 1992); Ismail v. Cohen, 899 F.2d 183,
186-87 (2d Cir. 1990); State of New York v. Hendrickson Bros., Inc., 840 F.2d 1065, 1077 (2d
Cir. 1988); *see also* Marcoux, 290 F. Supp. 2d at 474.

Review for excessiveness of jury awards under New York law is governed by C.P.L.R. §
5501(c), which provides in relevant part:

> The appellate division shall review questions of law and questions
> of fact on an appeal from a judgment or order of a court of original
> instance and on an appeal from an order of the supreme court . . . .
> In reviewing a money judgment in an action in which an itemized
> verdict is required by rule forty-one hundred eleven of this chapter
> in which it is contended that the award is excessive or inadequate
> and that a new trial should have been granted unless a stipulation is
> entered to a different award, the appellate division shall determine

21

> that an award is excessive or inadequate if it deviates materially
> from what would be reasonable compensation.

N.Y. CIV. PRAC. LAW AND RULES § 5501(c).

Section 5501(c) was enacted to "promote greater stability in the tort system and greater fairness for similarly situated defendants" throughout New York. Memorandum on Approving L. 1986, ch. 682, 1986 N.Y. Laws, at 3184 (cited in Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 423 (1996), and Donlon v. City of New York, 284 A.D.2d 13, 14, 727 N.Y.S.2d 94, 96 (1st Dep't 2001)). "The 'deviates materially' standard . . . influences outcomes by tightening the range of tolerable awards." Gasperini, 518 U.S. at 425. It is not surprising, then, that the determination of whether an award "deviates materially from what would be reasonable compensation" requires a court to compare verdicts sustained by New York courts in similar cases. See id. (citing, e.g., Leon v. J. & M. Peppe Realty Corp., 190 A.D.2d 400, 416, 596 N.Y.S.2d 380, 389 (1st Dep't 1993)); see also Marcoux, 290 F. Supp. 2d at 474-75.

Evaluating the reasonableness of a jury award under § 5501(c) by comparing similar cases "is not optional but a legislative mandate." Donlon, 284 A.D.2d at 16. "[T]he issue of material deviation . . . is a mixed question of law and fact which has been legislatively committed to judicial oversight." Id. Under § 5501(c), a reviewing court cannot refrain from tackling the material deviation inquiry by "attempt[ing] to use the rationale of deference to a jury verdict," because the reviewing court is "supposed to compare analogous verdicts." Id.

"Although phrased as a direction to New York's intermediate appellate courts, §5501(c)'s 'deviates materially' standard, as construed by New York's courts, instructs state trial judges as

22

well." Gasperini, 518 U.S. at 425 (citing, *inter alia*, Inya v. Ide Hyundai, Inc., 209 A.D.2d 1015, 619 N.Y.S.2d 440 (4th Dep't 1994), Cochetti v. Gralow, 192 A.D.2d 974, 975, 597 N.Y.S.2d 234, 235 (3d Dep't 1993) ("settled law" that trial courts conduct "materially deviates" inquiry), and Lightfoot v. Union Carbide Corp., 901 F. Supp. 166, 169 (S.D.N.Y. 1995) (C.P.L.R. 5501(c)'s "materially deviates" standard "is pretty well established as applicable to [state] trial and appellate courts.")).

Because New York trial courts apply § 5501(c), under Gasperini, so do federal district courts sitting in diversity. *See* Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938). The United States Supreme Court has specifically held that § 5501(c) – judicial review of a jury's award of damages in New York – is "manifestly substantive." Gasperini, 518 U.S. at 429. "[W]hen New York substantive law governs a claim for relief, New York law and decisions guide the allowable damages." Id. at 437. Federal district courts are "capable of performing the checking function" of § 5501(c) by reference to evolving state case law. Id.

As Judge Sweet has stated: "CPLR 5501(c) forces the court into the awkward position of attempting to . . . (implicitly) rank the affliction of one tort victim against that of another. . . . To measure the impact of a tragedy in the life of one person *vis-a-vis* another is beyond judicial (and perhaps human) capacity." In re Joint Eastern and Southern Dist. Asbestos Litig., 9 F. Supp. 2d 307, 311 (S.D.N.Y. 1998) [hereinafter Asbestos Litig.]. Although economic awards are quantifiable, awards for pain and suffering, or for loss of services and society, "do not lend themselves as easily to computation." *See* id. at 311-12 (citing McDougald v. Garber, 73 N.Y.2d

246, 254, 536 N.E.2d 372, 374-75 (1989)). "[M]easuring pain and suffering in dollars is inescapably subjective . . . ." Gibbs v. United States, 599 F.2d 36, 39 (2d Cir. 1979).

New York's Appellate Division has proclaimed a "'universal acknowledgment'" that a specific or definitive measure of damages for pain and suffering is "'impossible.'" Braun v. Ahmed, 127 A.D.2d 418, 424, 515 N.Y.S.2d 473 (2d Dep't 1987) (quoting Botta v. Brunner, 138 A.2d 713, 718 (N.J. 1958)). The Braun Court said: "'There is and there can be no fixed basis, table, standard or mathematical rule which will serve as an accurate index and guide to the establishment of damage awards for personal injuries. And it is equally plain that there is no measure by which the amount of pain and suffering endured by a particular human can be calculated. . . . [T]he impossibility of recognizing or of isolating fixed levels or plateaus of suffering must be conceded.'" Id. (quoting Botta, 138 A.2d at 718-19).

It is for this reason that "the determination of what amount would ["deviate materially" under § 5501(c)] is one of the most difficult decisions required to be made by a court. . . . [S]imilar injuries to two different plaintiffs may result in significantly different levels of pain and suffering, which makes the task of comparing the injuries in one case to those in another most formidable." Asbestos Litig., 9 F. Supp. 2d at 311 (citation and quotation omitted); *see also* Geressy v. Digital Equip. Corp., 980 F. Supp. 640, 656 (E.D.N.Y. 1997).

"To determine whether a particular award 'deviates materially from what would be reasonable compensation,' New York state courts look to awards approved in similar cases." Gasperini, 518 U.S. at 425. Prior awards are regarded as instructive, but not binding, by courts

24

performing § 5501(c) review. *See* Asbestos Litig., 9 F. Supp. 2d at 311 (citing Shea v.
Icelandair, 925 F. Supp. 1014, 1021 (S.D.N.Y. 1996), and Senko v. Fonda, 53 A.D.2d 638, 639,
384 N.Y.S.2d 849, 851 (2d Dep't 1976)). "Trial judges have the unique opportunity to consider
the evidence in the living courtroom context . . . ." Gasperini, 518 U.S. at 438 (quotation
omitted). But because the amount of damages to be awarded is primarily a question of fact for
the jury, a court should exercise its discretionary remittitur power sparingly. *See* Duncan v.
Hillebrandt, 239 A.D.2d 811, 813-14, 657 N.Y.S.2d 538, 540 (3d Dep't 1997) (citations
omitted).

The "material deviation" standard of § 5501(c) "has been understood by both courts and
commentators as providing courts with greater latitude than the former 'shocks the conscience'
standard for reviewing and altering jury awards." Asbestos Litig., 9 F. Supp. 2d at 310 (citing
Gasperini, 518 U.S. at 424-25). A district court must examine the evidence underlying the award
and compare the verdict to awards in similar cases. *See, e.g.*, Bachir v. Transoceanic Cable Ship
Co., 2002 WL 413918, at *11 (S.D.N.Y. Mar. 15, 2002). Nevertheless, great deference is given
to the interpretation of evidence by a jury. *See, e.g.*, Abar v. Freightliner Corp., 208 A.D.2d 999,
1001, 1002, 617 N.Y.S.2d 209 (3rd Dep't 1994); *see also* Bachir, 2002 WL 413918 at *11
(refusing to grant a new trial and deferring to the jury because its award was not against the
weight of the evidence, even though it was "on the higher end of the range"); Katt v. City of New
York, 151 F. Supp. 2d 313, 368 (S.D.N.Y. 2001).

Because awarding damages is the province of the jury, it is important for a court
performing a § 5501(c) review of a pain and suffering damages award to identify the "upper

25

limit" for such an award. *See* Asbestos Litig., 9 F. Supp. 2d at 312. By so doing, a court can order remittitur only to the extent necessary to comply with the "deviates materially" standard, while still giving effect to as much of the jury's award as possible. *See* Miraglia v. H & L Holding Corp., 36 A.D.3d 456, 456-57, 828 N.Y.S.2d 329 (1st Dep't 2007) (awarding maximum amount supported by evidence); *see also* Singleton v. City of New York, 496 F. Supp. 2d 390, 394 (S.D.N.Y. 2007) (noting that a court should be as least intrusive as possible in reducing the amount of a jury award); In re New York Asbestos Litig., 847 F. Supp. 1086, 1096 (S.D.N.Y. 1994) (stating that award should be maximum amount that would not be excessive). "Although possessing the power to set aside an excessive jury verdict, a trial court should nonetheless be wary of substituting its judgment for that of a panel of fact finders whose peculiar function is the fixation of damages. Modification of damages, which is a speculative endeavor, cannot be based upon case precedent alone, because comparison of injuries in different cases is virtually impossible." So v. Wing Tat Realty, Inc., 259 A.D.2d 373, 374, 687 N.Y.S.2d 99, 101 (1st Dep't 1999).

Defendants move for a new trial or for remittitur of the jury award. "'The role of the district court [sitting in diversity] is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered. The court of appeals should then review the district court's determination under an abuse-of-discretion standard.'" Gasperini, 518 U.S. at 435, 437 (quoting Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 279 (1989)).

A district court may grant a new trial if the jury has reached a seriously erroneous result or if the jury's verdict is a miscarriage of justice. *See* Kelleher v. New York State Trooper Fearon, 90 F. Supp. 2d 354, 362-63 (S.D.N.Y. 2000) (citing Sorlucco v. New York City Police Dep't, 971 F.2d 864, 875 (2d Cir.1992)). In determining whether to grant a new trial, the court may weigh the evidence on its own. *See* id. at 363 (citing Song v. Ives Labs., Inc., 957 F.2d 1041, 1047 (2d Cir. 1992)). "A new trial may be ordered even where there is substantial evidence to support the jury's verdict, and a new trial may be ordered on all or only some of the issues at the first trial." Id. (citation omitted); *see also* Singleton, 496 F. Supp. 2d at 394 (citing Vasbinder v. Scott, 976 F.2d 118, 122 (2d Cir. 1992)).

If a court finds that the jury's damages award is excessive, this does not mean that a new trial automatically occurs. Remittitur is the "'process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial.'" Kelleher, 90 F. Supp. 2d at 363 (quoting Earl v. Bouchard Transp. Co., 917 F.2d 1320, 1328 (2d Cir. 1990)); *see also* Lightfoot v. Union Carbide Corp., 110 F.3d 898, 914-915 (2d Cir. 1997). A plaintiff has the right to refuse the remittitur. *See, e.g.,* Singleton, 496 F. Supp. 2d at 394.

The Court's remittitur of the jury's award to Mr. Okraynets for pain and suffering, and to Mrs. Okraynets for loss of services and society, is explained below.

27

## A.     Past and Future Pain and Suffering

Dmitry Okraynets' accident resulted in the following injuries, among others: a burst fracture at the T12/L1 vertebra causing paraplegia; pneumothorax (collapsed lung); several rib fractures; numerous surgeries; infection; urinary and fecal incontinence; loss of sexual function; cognitive defects; chronic pain; depression; and emotional trauma for which he takes medication. (*See* Court Ex. 9; Tr. 60-66, 103, 352-53, 440-45, 469.) Due to his injuries, plaintiff – an otherwise healthy young man – is wheelchair-bound. He is unable to perform sexually. He is unable to control his bowels or bladder. He must perform self-catheterization and bowel disimpaction multiple times a day. (*See* Tr. 31-34, 369-76, 440, 534.)   Despite this routine, he still experiences accidents on occasion. (Tr. 451-54.) Plaintiff's expert, Dr. Fried, testified that Mr. Okraynets suffers from a syrinx condition, which, if it progresses, might render Mr. Okraynets a quadriplegic in the future. (Tr. 379-84, 388-89.)

The jury awarded Dmitry Okraynets $5 million for his past pain and suffering from these injuries, and $15 million for pain and suffering he will endure in the future, assuming a life expectancy of 39 more years. Although there is extensive evidence in the record supporting a substantial award to Mr. Okraynets for pain and suffering, a review of awards approved in comparable cases reveals that the jury's award for pain and suffering deviates materially from what would be reasonable compensation under § 5501(c).

For non-economic awards (e.g., pain and suffering), "the reviewing court must begin by identifying some group of similar cases to serve as a referent" because the "concept of reasonable compensation cannot exist in a vacuum." Geressy, 980 F. Supp. at 656. Recent decisions from

28

New York's Appellate Division involving paraplegic plaintiffs provide useful comparisons for evaluating the jury's award for pain and suffering in this case. *See* id. at 657 (noting that similar injuries or diagnoses are primary criteria in choosing sufficiently analogous cases); *see also* Garcia v. Queens Surface Corp., 271 A.D.2d 277, 278, 707 N.Y.S.2d 53 (1st Dep't 2000) (stating that courts, when comparing injuries and awards, should consider the type of injury, the level of pain, and the age of the plaintiff).

In Miraglia v. H & L Holding Corp., 36 A.D.3d 456, 456, 828 N.Y.S.2d 329 (1st Dep't 2007), the plaintiff was a 45-year-old construction worker who was rendered a paraplegic as a result of a fall on the job site. On appeal, the Appellate Division (First Department) sustained Mr. Miraglia's award of $5 million for past pain and suffering, but found that the future pain and suffering award of $10 million over 35 years should be reduced to $5 million, for an aggregate pain and suffering award of $10 million. Id.

Defendants argue that the nature of Mr. Miraglia's injury made his "condition and suffering worse than" that of Mr. Okraynets, because, for example, Mr. Miraglia was impaled by a steel rod. (Dkt. #66, Defs.' Mem. at 11-12.) However, no two cases are exactly the same (for example, Mr. Miraglia was 45 years old— considerably older than Mr. Okraynets), and "any given judgment is based on its own facts and circumstances." *See* Carmody v. ProNav Ship Mgmt., Inc., 224 F.R.D. 111, 128 (S.D.N.Y. 2004). The fact remains that both Mr. Miraglia and Mr. Okraynets were rendered paraplegics as a result of devastating, on-the-job falls at construction sites. And a $10 million aggregate award for pain and suffering was deemed appropriate in Miraglia.

29

The First Department also approved an aggregate pain and suffering award of $10 million in Ruby v. Budget Rent-A-Car Corp., 23 A.D.3d 257, 257, 806 N.Y.S.2d 12 (1st Dep't 2005). Mr. Ruby's spine was severed in an accident, resulting in paraplegia and associated complications similar to those of Mr. Okraynets, including chronic pain, bowel and bladder incontinence, loss of sexual function, and psychological complications. Mr. Ruby was 25 years old at the time of his accident (a young man like Mr. Okraynets), and his award for future pain and suffering was based on a life expectancy of 44.6 more years (similar to Mr. Okraynets' total life expectancy). The jury awarded Mr. Ruby $3 million for past pain and suffering and $12 million for future pain and suffering. These pain and suffering awards were reduced by the court to $2 million and $8 million, respectively. Id.

Non-paraplegia cases also prove instructive in performing a comparative analysis under § 5501(c). In Bondi v. Bambrick, 308 A.D.2d 330, 764 N.Y.S.2d 674 (1st Dep't 2003), the plaintiff was a 35-year-old woman who was struck by a drunk driver while she was a passenger on a motorcycle. Ms. Bondi lost part of her left leg in the accident, underwent multiple surgeries prior to the trial, and was left with a wound at the area of amputation that might never heal. The jury awarded Ms. Bondi pain and suffering damages of $2.25 million (past) and $7.5 million (future, over 50 years). On appeal, the First Department found that this aggregate award of $9.75 million did not deviate from reasonable compensation. Id. at 331.

To be sure, no two plaintiffs are exactly alike, and differences exist among the plaintiffs (and the injuries suffered) in Miraglia, Ruby, and Bondi  But one common thread that runs

30

through all three cases is that an aggregate pain and suffering award of $10 million was found not to be excessive.

Defendants cite cases in which very seriously injured plaintiffs received lesser awards for pain and suffering than in the cases described above. But I am not trying to ascertain an "average" award based on comparable cases; rather, under § 5501(c), I seek to assess what amount is the "highest amount of compensation allowable," based on the evidence, that would not deviate materially from reasonable compensation. *See* Kirschhoffer v. Van Dyke, 173 A.D.2d 7, 11, 577 N.Y.S.2d 512 (3rd Dep't 1991) (performing review under § 5501(c) and awarding the "highest amounts that can be justified"); *see also* Singleton, 496 F. Supp. 2d at 394; In re New York Asbestos Litig., 847 F. Supp. at 1096; Balmaceda v. Perez, 182 A.D.2d 983, 984, 581 N.Y.S.2d 925 (3d Dep't 1992). "[R]eduction [of a jury award for damages] can only be permitted so far as the 'maximum amount that would be upheld . . . as not excessive' and not a penny less." In re New York Asbestos Litig., 847 F. Supp. at 1096 (quoting Earl, 917 F.2d at 1330).

Plaintiffs argue that the entire pain and suffering award should be affirmed, because the notion of what is "reasonable compensation" inevitably shifts over time; otherwise, damages awards – if tied to awards in prior cases – would remain static indefinitely. Of course, relying strictly and inflexibly on past precedent alone would result in static damages for future plaintiffs. *See* Wing Tat Realty, 259 A.D.2d at 374.   But plaintiffs' argument ignores the mandate of § 5501(c), which requires a review of comparable cases in deciding whether a damages award deviates materially from reasonable compensation. Moreover, the standard under § 5501(c) is

31

not whether an award deviates *at all* from past awards— it is whether an award deviates *materially* from *reasonable compensation*. Thus, jury awards for pain and suffering will not inevitably remain constant over time, contrary to the "parade of horribles" that plaintiffs contend will result if this Court looks to damages awards in comparable cases in assessing whether the award in this case is excessive. (Dkt. #70, Pls.' Mem. at 3.) Furthermore, the awards cited above were all made within the past few years, between 2003 and 2007. They are appropriate comparators.

In light of the pain and suffering awards approved in recent cases, I conclude that the jury's aggregate pain and suffering award of $20 million to Mr. Okraynets (past award of $5 million, future award of $15 million) is excessive under § 5501(c) because it deviates materially from what would be reasonable compensation. I further conclude that the maximum awards that would not be excessive for past and future pain and suffering are $2,500,000 and $8,000,000, respectively. This Court will schedule a new trial on the question of past and future pain and suffering damages unless plaintiff, within 30 days of this decision, stipulates to this reduction.

## B.    Loss of Services and Society

Defendants also move for a new trial with regard to the jury's award to Mrs. Okraynets for loss of services and society. The Court finds that this award, too, deviates materially from what would be reasonable compensation.

The story of Mr. and Mrs. Okraynets' relationship is an inspiring one. Dmitry Okraynets emigrated from the Soviet Union to the United States when he was 13 years old. He met Tatiana

32

on a trip in 2000 to visit his family in Kharkov, Ukraine, and the two fell in love. He proposed in late 2001, and Tatiana moved to the United States in June 2002. They were married that same month, and in June 2003 Tatiana gave birth to their son. The record reflects the close-knit nature of the Okraynets household, as well as Dmitry and Tatiana's love and affection for one another. Prior to his accident, Mr. Okraynets was the primary wage earner, and he provided a variety of services to the family. Due to his injury, Mr. Okraynets can no longer provide any services of a physical nature, and marital intimacy no longer exists. (Tr. 199-207.)

For her derivative claim of loss of services and society, the jury awarded Tatiana Okraynets past and future damages of $1,000,000 and $4,000,000, respectively. As was done with Mr. Okraynets' damages award for pain and suffering, Mrs. Okraynets' award for loss of services and society, too, must be reviewed under C.P.L.R. § 5501(c). And as was the case with Mr. Okraynets' pain and suffering award, a review of loss of consortium awards approved in comparable cases indicates that the jury's award in this case is excessive under § 5501(c).

Under New York law, consortium (i.e., services and society) represents each marital partner's interest in the continuance of the marital relationship as it existed at the inception of the marriage. Consorti v. Owens-Corning Fiberglas Corp., 86 N.Y.2d 449, 450, 657 N.E.2d 1301 (1995) (citing Anderson v. Eli Lilly & Co., 79 N.Y.2d 797, 798, 588 N.E.2d 66 (1991)).

The myriad cases cited by defendants reveal that awards for loss of consortium in New York, after review under § 5501(c), often fall within a low six-figure range, if not lower. In Walsh v. State of New York, 232 A.D.2d 939, 648 N.Y.S.2d 816 (3d Dep't 1996), the plaintiff –

33

28 years old at the time of the accident – was injured when he fell while performing electrical work at a state building. The fall resulted in permanent nerve damage, significant loss of function in his back and lower extremities, limb disfigurement, and ongoing pain. However, there is no indication from the Appellate Division's decision that plaintiff's injury rendered him impotent. Plaintiff had to "modify or curtail his own work and leisure activities, as well as his participation in the pursuits of his young children," and his "ability to do household chores and to care for his children [had] also been markedly diminished." Id. at 940. In light of the "substantial and permanent limitations on [plaintiff's] activities . . . and the sacrifices his wife has had to make to care for him and maintain their household," the court found that an award of $185,000 on the wife's derivative claim was not excessive or unreasonable. Id.

In DeLeonibus v. Scognamillo, 238 A.D.2d 301, 656 N.Y.S.2d 275 (2d Dep't 1997), the 34-year-old plaintiff sustained severe and permanent orthopedic and neurological injuries, resulting in chronic pain and depression. Plaintiff was described as inactive, with an "awful" prognosis and a condition that was "very disabling." Id. at 302. Plaintiff did not lose sexual function, however, since he and his wife apparently conceived three children after the date of the accident. See Appellants' Br., 1996 WL 34422416, at *7 (June 27, 1996). As a result of plaintiff's injury, Mrs. DeLeonibus undertook all of the household services her husband once performed. The jury's award of $275,000 on plaintiff's wife's derivative claim was sustained by the Appellate Division: "Under the circumstances, we find that the jury's award to DeLeonibus's wife for past and future loss of services does not deviate materially from what would be reasonable compensation." Id.

34

In <u>Kirby v. Turner Constr. Co.</u>, 286 A.D.2d 618, 730 N.Y.S.2d 314 (1st Dep't 2001), the plaintiff, a 31-year-old foreman for the ironworkers' union, was injured when he fell approximately 20 feet while working at a construction site. His injuries included compression fractures at two vertebra requiring fusion surgery, disc dessication at two vertebra, a severe hip contusion, and depression. 2000 WL 33724723 (N.Y. Sup. Ct. Mar. 1, 2000). Plaintiff wore a back brace and required a cane to ambulate. The jury awarded plaintiff's wife $700,000 in damages for loss of services ($350,000 past, $350,000 future). Upon review, the trial court observed that "while [Mr. Kirby] is still in pain and has lost the ability to perform certain tasks, he is nevertheless able to perform many daily tasks, including driving." *See* N.Y.L.J. Vol. 224, No. 88 (N.Y. Sup. Ct. Nov. 6, 2000) (Bransten, J.). As a result, the court found that Mrs. Kirby's derivative award would deviate materially from reasonable compensation unless it was reduced to an aggregate award of $300,000 ($100,000 past and $200,000 future). <u>Id.</u> This set of facts is not even close to the case of Mr. Okraynets, who was paralyzed and is certainly unable to "perform many daily tasks."

Finally, a $400,000 derivative award was found appropriate in <u>Kirschhoffer v. Van Dyke</u>, 173 A.D.2d 7, 577 N.Y.S.2d 512 (3d Dep't 1991). Mrs. Kirschhoffer was injured when her car collided with a dump truck, and she was required to undergo spinal fusion surgery. <u>Id.</u> at 8, 10. The jury awarded her husband $1.8 million for his derivative cause of action, which was reduced to $750,000 by the trial court. <u>Id.</u> at 8. This award was further reduced, pursuant to § 5501(c), by the Appellate Division, which stated that the highest amount that could be justified was $400,000, particularly in light of the fact that the injured plaintiff's condition had improved to

35

the point where she could "do some walking" and perform some "light housework." Id. at 10-11. Once again, this case is a far cry from the situation Mr. Okraynets faces, as he will never again be able to "do some walking." And once again, there is no indication that the plaintiff in this case forever lost the ability to perform sexually, as did Mr. Okraynets.

Like the injured plaintiffs in Walsh, DeLeonibus, Kirby, and Kirschhoffer, Dmitry Okraynets' ability to participate in family life changed drastically after his accident. And like the spouses in those cases, Mrs. Okraynets is left without her husband's physical services, and is required to maintain the household as a result. However, none of the cases discussed above involved a paraplegic plaintiff. Unlike Kirschhoffer – in which the Appellate Division (in 1991) approved a $400,000 loss of services award to the spouse of a non-paraplegic plaintiff – Mr. Okraynets will never be able to walk again, and it is highly improbable that he will be able to perform "many daily tasks" like the plaintiff in Kirby. Consequently, Mrs. Okraynets is almost entirely deprived of her husband's services for the duration of his life. In addition, because Mr. Okraynets' paraplegia resulted in a loss of sexual function, Mrs. Okraynets can never again experience the marital intimacy with her husband that she had envisioned at the inception of their marriage. And due to Mr. Okraynets' incontinence problems, he and his wife will likely need to sleep in separate beds.

Plaintiff cites Doe v. State, 189 A.D.2d 199, 595 N.Y.S.2d 592 (4th Dep't 1993), in which a loss of consortium award of $1 million ($250,000 past and $750,000 future) was sustained. In that case, the plaintiff was a nurse who contracted HIV after she was stuck by a needle contaminated with the blood of an AIDS patient. Her husband brought a derivative claim

36

for loss of consortium, based on the fact that as a result of his wife's infection, the quality and extent of the couple's sexual activity was drastically altered, and he would be required to perform the services that his wife had previously provided to the family. The Appellate Division upheld the Court of Claims' past and future loss of consortium awards of $250,000 and $750,000, respectively, noting: "On this record, it cannot be said that the award deviates materially from what would be reasonable compensation." Id. at 205.

Doe, however, presents an entirely different set of facts than the case at bar. For example, in sustaining the loss of consortium award to Mr. Doe, the Appellate Division remarked that "he alone will have to provide for his family's emotional well-being" in the near future, because his wife, as a result of being infected with HIV, only had a life expectancy of 5.5 years. See id. at 205, 207. Unlike the plaintiff in Doe, Dmitry Okraynets will still be able to participate in his family's affairs on an emotional level for many years to come, even if his injuries prevent him from performing physical services. Doe also appears to be inapposite from a procedural perspective because it was tried before a judge, not a jury.[4]

This court has checked the jury's verdict against relevant New York decisions containing awards for loss of consortium. After reviewing awards for loss of services and society in comparable cases, I conclude that the highest amount that Mrs. Okraynets can receive on her

---

[4] The loss of consortium award in Doe was rendered by Judge Margolis of the Court of Claims. See Doe v. State, 155 Misc.2d 286, 588 N.Y.S.2d 698 (Ct. Cl. 1992). This award was then reviewed on appeal by the Appellate Division, which applied § 5501( c ). See Doe, 189 A.D.2d at 205. However, by its own terms, § 5501( c ) states that the "material deviation" standard applies when "reviewing a money judgment in an action in which an itemized verdict is required by rule forty-one hundred eleven . . . in which it is contended that the award is excessive or inadequate and that a new trial should have been granted unless a stipulation is entered to a different award . . . ." C.P.L.R. § 5501( c ) (emphasis added). Rule 4111 governs verdicts and awards by juries, not judges. See N.Y. C.P.L.R. Rule 4111.

derivative claim, without deviating materially from reasonable compensation, is an aggregate award of $750,000— $100,000 in past damages for loss of services and society, and $650,000 in future damages. Defendants' motion for a new trial on Mrs. Okraynets' claim for loss of services and society will be granted unless plaintiffs, within 30 days of the date of this decision, stipulate to a reduction of Mrs. Okraynets past award from $1 million to $100,000, and a reduction of her future award from $4 million to $650,000.

## III.   Fringe Benefits

### *Background*

Several months prior to trial, defendants submitted a motion *in limine* for an order excluding evidence of past and future benefit loss (Dkt. #46– #48), which I denied at the final pretrial conference. The fringe benefits issue was the subject of competing expert testimony. Defendants did not establish, prior to trial, that Mr. Welsch utilized unacceptable methodology. It was not until Mr. Welsch testified at trial that it became apparent that some of his assumptions regarding certain fringe benefit subcategories were unreasonable as a matter of law.

During the trial, the jury heard extensive testimony from both sides regarding Mr. Okraynets' loss of fringe benefits. At the conclusion of plaintiffs' expert Mr. Welsch's testimony, defendants moved to strike his testimony regarding fringe benefit loss on the bases that his testimony was speculative, and that Mr. Okraynets' fringe benefits loss calculation was unsupported by the evidence. Defendants also requested that the jury be instructed to disregard the testimony about Mr. Okraynets' claim for loss of fringe benefits altogether. Those motions were denied. (Tr. 337.) At the close of plaintiffs' evidence, defendants made a motion under

38

Rule 50 seeking judgment as a matter of law on the claims for lost fringe benefits. That motion, too, was denied. (Tr. 456-57.)

Defendants now renew their Rule 50 trial motion and request that the jury's award for loss of fringe benefits be vacated as unproven as a matter of law. Defendants' argument is twofold: (1) Mr. Welsch never actually calculated the projected loss to Mr. Okraynets for certain fringe benefit categories; and (2) the sum contained in Mr. Welsch's report included amounts that would have been paid by Mr. Okraynets' employers directly to the union, but not by the union to Mr. Okraynets.

In their pre-trial motion *in limine*, defendants sought to exclude *all* of Mr. Welsch's testimony. But plaintiff's expert was not unqualified and his methodology was not inherently flawed. This is why defendants' motion *in limine* was denied. The Court agreed with the following statement in plaintiffs' opposition to defendants' motion in limine:

> Under the circumstances, the relief requested by the defendants –
> barring all testimony about benefits – is akin to throwing the baby
> out with the bathwater. The plaintiffs' economist's report could use
> some updating based on after-acquired information. Striking all
> references to benefits because the report was based on the more
> limited information available at the time it was drafted, rather than
> updating it, is an unwarranted and extreme remedy. Accordingly,
> the defendants' motion should be denied.

(Dkt. #58, Pls.' Opp. Mem. at 9.)

Defendants do not now dispute that the value of future fringe benefits is compensable economic loss in New York. (Indeed, the report of defendants' own economist, Dr. Fred Goldman, projected that Mr. Okraynets should receive an award for loss of fringe benefits of

39

approximately $2.2 million. (*See* Tr. 713-16, 756.))  Rather, defendants contend that the evidence

presented by plaintiff is legally insufficient to support the jury's award for loss of fringe benefits.

This Court can order a new trial as to particular damages, conditioned on plaintiff's

refusal to agree to remittitur, if there is an identifiable error that caused the jury to include in its

verdict a quantifiable amount that is unsupportable as a matter of law.  *See* Kirsch v. Fleet Street,

Ltd., 148 F.3d 149, 165 (2d Cir. 1998).  After carefully reviewing the extensive trial testimony of

the economists, the Court finds that certain assumptions by Mr. Welsch are unsupportable as a

matter of law.  And with regard to the jury's award for loss of future fringe benefits, the Court

can quantify the erroneous portion of the award with reasonable certainty.

### *Legal Standard*

"Rule 50(b) allows the Court to enter a judgment notwithstanding the jury's verdict

whenever the law so requires." Kelleher v. New York State Trooper Fearon, 90 F. Supp. 2d 354,

360 (S.D.N.Y. 2000).  A court can grant judgment as a matter of law under Rule 50 if it

concludes that the evidence, viewed in the light most favorable to the opposing party, is

insufficient to permit a reasonable juror to make a particular finding.  *See* Galdieri-Ambrosini v.

Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir. 1998) (cited in Kelleher, 90 F. Supp. 2d at

360).  Thus, in deciding a Rule 50 motion, a court may not itself assess the weight of conflicting

evidence or pass on the credibility of witnesses— it must give deference to the reasonable

inferences of the jury.  *See* Kelleher, 90 F. Supp. 2d at 360; Geressy v. Digital Equip. Corp., 980

F. Supp. 640, 646 (E.D.N.Y. 1997).  Judgment as a matter of law should not be granted unless

there is a "complete absence of evidence supporting the verdict" or "there is such an

overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at" the verdict rendered by the jury. *See* Kirsch, 148 F.3d 149, 161 (2d Cir. 1998) (citing Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1154 (2d Cir. 1994); *see also* Geressy, 980 F. Supp. at 646.

Whereas pain and suffering cannot be quantified, *see, e.g.*, McDougald v. Garber, 73 N.Y.2d 246, 254, 536 N.E.2d 372, 374-75 (1989), economic loss must be established with reasonable certainty. *See, e.g.*, Tassone v. Mid-Valley Oil Co., Inc., 5 A.D.3d 931, 932, 773 N.Y.S.2d 744 (3d Dep't 2004); Faas v. State of New York, 249 A.D.2d 731, 732-33, 672 N.Y.S.2d 145 (3d Dep't 1998). However, it is not necessary – nor is it possible – to establish future economic damages with mathematical certainty. *See, e.g.*, E. W. Bruno Co. v. Friedberg, 28 A.D.2d 91, 94, 281 N.Y.S.2d 504 (1st Dep't 1967). Under New York law, it is "well established" that "'[t]he rule of certainty as applied to the recovery of damages does not require mathematical accuracy or absolute certainty or exactness, but only that the loss or damage be capable of ascertainment with reasonable certainty.'" Reichman v. Warehouse One, Inc., 173 A.D.2d 250, 252, 569 N.Y.S.2d 452 (1st Dep't 1991) (quoting 36 N.Y. JUR. 2d Damages, § 15). In essence, economic damages need not be exact, but they cannot be speculative. *See* Stringile v. Rothman, 142 A.D.2d 637, 641, 530 N.Y.S.2d 838 (2d Dep't 1988).

The plaintiff bears the burden of proving economic loss, and future loss may be established using expert testimony that assesses future probabilities. *See* Tassone, 5 A.D.3d at 932; Walsh, 232 A.D.2d at 941; Kirschhoffer, 173 A.D.2d at 10. An expert's opinion must be based on facts that are supported by the evidence, Cassano v. Hagstrom, 5 N.Y.2d 643, 646, 159

41

N.E.2d 348, 349 (1959), or are "fairly inferable from the evidence." Tarlowe v. Metro. Ski Slopes, Inc., 28 N.Y.2d 410, 414, 271 N.E.2d 515, 516 (1971); *see also* Freitag v. New York Times, 260 A.D.2d 748, 749, 687 N.Y.S.2d 809 (3rd Dep't 1999).  Thus, with regard to future economic loss, Mr. Okraynets should only receive damages now for compensation that it is reasonably certain he would have received in the future.

In his opposition to defendants' pre-trial motion *in limine* to exclude evidence as to any past or future loss of benefits, plaintiff essentially agreed with defendants that Mr. Welsch's methodology and calculations might need to be revised in light of the deposition testimony of the union's pension fund manager, Robert Ward, which was taken after plaintiff served Mr. Welsch's expert report.  Plaintiff stated: "[T]he defendant[s'] motion [*in limine*] is based on evidence that did not exist at the time [Mr. Welsch] made his projections.  The plaintiff's expert worked with the information he had: benefits numbers taken from the plaintiff's payroll records. *Of course the plaintiff's expert, when he testifies, will take into account the subsequently learned information; if he were not to do so, defense counsel would surely elicit this on cross-examination.*"  (Dkt. #58, Pls.' Opp. Mem. at 5 (emphasis added).)

Mr. Welsch, to my surprise (and, no doubt, to defendants') did *not* take into account "subsequently learned" information.  Nor did he update his calculations to exclude benefits that plaintiff, in his opposition to defendants' motion *in limine*, said he would not seek.  The jury awarded plaintiff the exact amount – $4,214,734 – that Mr. Welsch recommended, despite the fact that plaintiffs' counsel told the Court that new evidence needed to be taken into account.  For this reason, the jury's award must be reduced.

42

A jury's verdict "'should not be set aside as against the weight of the evidence unless it is palpably wrong and there is no fair interpretation of the evidence to support the jury's conclusion or if the verdict is one reasonable persons could have rendered after receiving conflicting evidence.'" Czerniejewski v. Stewart-Glapat Corp., 269 A.D.2d 772, 703 N.Y.S.2d 621 (4th Dep't 2000) (quoting Petrovski v. Fornes, 125 A.D.2d 972, 973, 510 N.Y.S.2d 366 (4th Dep't 1986)). This is one of those cases where the jury's award for loss of future fringe benefits is palpably wrong (in part) for the reasons discussed below, and no fair interpretation of the evidence would support awarding the entire amount projected by Mr. Welsch. *See* Kirsch, 148 F.3d at 161 (citing Cruz, 34 F.3d at 1154); *see also* Geressy, 980 F. Supp. at 646. Dmitry Okraynets cannot receive compensation for money that would never directly inure to him. Based on the record, the amount of $3,730,000 represents a proper and supported award to Mr. Okraynets for loss of future fringe benefits.

### *Future Loss of Fringe Benefits, Category by Category*

Mr. Welsch projected Mr. Okraynets' loss of future fringe benefits to be $4,214,734— the exact amount awarded by the jury. (*See* PX 47; Court Ex. 14.) In reaching this amount, Mr. Welsch testified that he relied upon the most recent figures from the Dockbuilder & Heavy Carpenter Agreement (Journeyman, Foreman & General Foreman) that was effective through June 2006. He did not have access to the 2006–2011 contract when he originally prepared his report, which is why he used the most recent figures from 2006. (Tr. 310-11.) Employers agreed

43

to pay the following fringe benefit contributions from July 2005 – June 2006:

| Welfare | $9.50 |
| Pension | $7.81 |
| Annuity | $6.10 |
| A.J.R.E.I.F. | $0.50 |
| Vacation | $5.41 |
| Supplemental | $0.04 |
| Int'l Bhd. Carpenters (IBC) | $0.06 |
| N.Y.D.C.C. Labor/Mgmt. | $0.20 |
| Supplemental Pension | $1.00 |

(*See* DX 41.)

## A.    Welfare and Vacation

Mr. Welsch excluded the welfare fund from his calculation of $4,214,734 because he deemed it inappropriate to count medical insurance as a benefit Mr. Okraynets would have received had he not been injured. (Tr. 312.) Defendants' expert Dr. Goldman agreed that it was appropriate to exclude this benefit from the loss projection. (Tr. 764-65.)

Likewise, Mr. Welsch did not include vacation because he felt it was inappropriate to seek compensation for vacation while also projecting lost wages based on 52 weeks a year. (Tr. 320.) However, vacation benefits are paid per hour worked, regardless of the number of weeks worked per year (assuming the minimum hours worked threshold to receive fringe benefits has been met). In fact, vacation benefits *were* included in the calculations by the opposing expert, Dr. Goldman. (*See* Tr. 756.) Thus, in this respect, one might consider Mr. Welsch's projections to be conservative.

44

**B.    Indirect Benefits: A.J.R.E.I.F., IBC, N.Y.D.C.C., and Supplemental Benefits**

Mr. Welsch included certain fringe benefit employer contributions in his projection for lost fringe benefits, even though those fringe benefit subcategories would never be received directly by Mr. Okraynets. These contributions, which are paid by employers as part of the union rate schedule, include contributions to the A.J.R.E.I.F. apprentice fund, the International Brotherhood of Carpenters, and the N.Y.D.C.C. labor management, as well as supplemental contributions. (Tr. 202, 315-19.) Union divisions and agencies are the recipients of these contributions, not the worker. Indeed, Mr. Welsch testified that the employers' contributions for these items would never be received directly by Mr. Okraynets. (Id.) Therefore, the portion of the jury's future fringe benefit loss that represents these particular benefits cannot possibly meet the "reasonable certainty" standard for proving economic damages.

Plaintiff contends – as did Mr. Welsch during trial – that these contributions should be included as fringe benefits to plaintiff because, had he not been injured, his continued livelihood would have required a strong carpenter's union, and the union relies upon the employers' contributions, described above, for its strength. But the future strength of the union has no bearing on the award Mr. Okraynets receives now. As defendants point out in their post-trial memorandum, even if the carpenter's union suddenly collapsed, plaintiff would still retain his lost earnings award. Thus, Mr. Welsch's justification for including these subcategories in his loss calculation does not pass muster.

One of the reasons why I denied defendants' pre-trial motion *in limine* for an order

45

excluding evidence of past and future benefit loss was because plaintiff stated the following in

his opposition to defendants' motion:

> Mr. Ward[, the union's pension fund manager,] explained that a
> series of miscellaneous pay stub line items cover apprenticeship
> programs, scholarship programs, charitable contributions by the
> union, contributions to the national union headquarters and the
> union district office, and a contribution to enhance the solvency of
> the pension fund, all of which do not inure to the plaintiff's benefit
> in the form of any direct benefit to the plaintiff. * * * *Now that we
> have the benefit of Mr. Ward's testimony, plaintiff will not be
> pursuing these line items at trial.*

(Dkt. #58, Pls.' Opp. Mem. at 8 (citations omitted) (emphasis added).)

Based on this statement, I was under the impression that Mr. Welsch would amend his

opinion at trial. After carefully reviewing the record, however, it is clear that Mr. Welsch did not

do so— his testimony at trial directly contradicted what plaintiffs said, in their opposition to

defendants' motion *in limine*, that they would (or would not) do at trial. Mr. Welsch's

projections for future loss of fringe benefits must be reduced by the amount of the erroneously

included categories.

As I already explained, Mr. Welsch testified that he did not include the "Welfare" or

"Vacation" benefits in his calculations. That being so – and putting aside the erroneously

included indirect benefits – the only remaining fringe benefits from the table provided above are

"Pension" and "Annuity." These two categories make up the bulk of plaintiff's projected future

fringe benefits, since"Welfare" and "Vacation" benefits were not included. If combined with the

erroneously included indirect benefits, the Pension and Annuity benefits represent 88.5% of the

total benefits included in the projections.

46

88.5% of the jury's award of $4,214,734 (the same amount as Mr. Welsch's projection) is $3,730,000. That is the maximum amount supported by the evidence (i.e., excluding indirect fringe benefits) that Mr. Okraynets can receive for loss of future fringe benefits.

### C.    Annuity and Pension

Both sides' economists included the annuity benefit in their projections. (*See* Tr. 319, 756.) Mr. Welsch testified that if Mr. Okraynets had not been injured and had continued to work, the annuity benefit would have been worth at least as much as the $6.10 per hour used in his projections, and "conservatively probably more." (Tr. 319.) Defendants do not make a compelling case for why Mr. Welsch's projections, specifically with regard to the annuity benefit, fail as a matter of law. Defendants do, however, vigorously dispute Mr. Welsch's calculations regarding the future pension benefit. They contend that plaintiff did not prove the pension benefits component of these "fringe benefits" damages with reasonable certainty. I reject defendants' argument.

The two experts used different methods to calculate future pension benefits. Defendants' expert, Dr. Goldman, testified that the proper way to estimate Mr. Okraynets' future pension benefit is as follows: (1) estimate the number of hours plaintiff would work in a year and multiply it by the hourly pension contribution rate in order to get the total pension contribution for the year; (2) multiply that number by 1% and set it aside to be included in plaintiff's monthly pension upon retirement; (3) the plaintiff's monthly pension, upon the end of his work life, is equal to the sum of all the 1% contributions set aside, plus investment growth (i.e., multiply this

47

sum by twelve to calculate the yearly pension); and (4) plaintiff would continue to receive this
monthly pension payment for the remainder of his life expectancy. (Tr. 744-45.) Of course, this
method rests on several assumptions, including plaintiff's expected retirement age, his life
expectancy, the proper way to reduce the pension payments to the present value, and the belief
that the pension fund will not change its formula in the future.

Mr. Welsch confirmed that he did not attempt to calculate the lost pension that Mr.
Okraynets would have received upon retirement had he continued working throughout his life
expectancy. (*See* Tr. 312-14.) Instead, Mr. Welsch chose to include the full amount of the
hourly pension contributions, using it as a proxy for what Mr. Okraynets would have received in
total pension benefits upon retirement had he not been injured. Mr. Welsch was aware of the
pension fund manager's testimony, which described the method advocated by Dr. Goldman, but
intentionally refrained from estimating the value of the future pension payments, saying that to
do so would require improper speculation. (*See* Tr. 313.) Mr. Welsch stated:

> [I]t would have been at best speculative and at worst impossible to
> actually calculate what that one percent would have been worth in
> another 30 years. . . . no, I did not attempt to estimate what his
> actual pension payment would have been.
> * * *
> [W]hat I calculated was the employer's contribution. I didn't see it
> as being a loss to the pension fund. I saw it as being a loss to Mr.
> Okraynets which would not have manifested itself until his date of
> retirement.

(Tr. 313-15.)

One reason Mr. Welsch used the hourly pension contribution figures, rather than
estimating future pension payments, is because pension plans have a right to amend their plans in

48

the future. To avoid speculation, Mr. Welsch chose the methodology that he did because he could not "anticipate what the union might or might not do [in the future] with respect to its formula for paying pension benefits." (Tr. 323-24).

The jury had before it two competing experts who used different methodologies to calculate lost future fringe benefits. It was the province of the jurors to choose whose testimony was more persuasive. They chose plaintiffs' expert. I cannot say, as a matter of law, that thy were wrong to do so. Mr. Welsch's projections regarding annuity and pension benefits were based on reasonable assumptions and methodologies. There is no evidence that Dr. Goldman's formula is the only formula that can be used to project future pension benefits, particularly in light of the fact that Dr. Goldman's methodology required him to make several assumptions that Mr. Welsch's methodology did not require. Therefore, once the erroneously included indirect benefits (A.J.R.E.I.F., IBC, N.Y.D.C.C., and supplemental contributions) are subtracted, the damages award to Mr. Okraynets for loss of future fringe benefits was proven with reasonable certainty.

It should be noted that the excessiveness standard of § 5501(c) also applies to future economic damages. *Cf.* Tassone, 5 A.D.3d at 932-33; Walsh, 232 A.D.2d at 941. Mr. Welsch's projections (erroneously included subcategories aside) were not excessive. In some ways, his projections were conservative. For example, Mr. Welsch could have included vacation benefits in his projections (like Dr. Goldman did), which would have increased his estimate of future losses. Mr. Welsch also chose to base his calculations on the 2001-2006 fringe benefits contract, even though he could have used the 2006-2011 contribution figures, which were higher.

49

To sum up, defendants contend that the jury's award for past and future fringe benefits must be set aside as not proven with reasonable certainty as a matter of law. The Court agrees that one aspect of the award for future damages was not proven as a matter of law, but believes that the evidence on fringe benefits, overall, was sufficient for the jury to render a verdict on past and future fringe benefits, and a large one at that. *Cf.* Tassone, 5 A.D.3d at 932-33. Plaintiff has thirty days from the date of this decision to agree to a remittitur of the award for loss of future fringe from $4,214,734 to $3,730,000; otherwise, the Court will order a new trial on the issue of lost future fringe benefits.

As for Mr. Okraynets' award for loss of past fringe benefits, the jury did not award an exact amount that was suggested by plaintiff's expert, which means the jury did not necessarily adopt Mr. Welsch's assumptions and calculations with regard to past fringe benefits. Therefore, I see no basis to disturb the jury's $53,049 award for loss of past fringe benefits.

## IV. Past and Future Lost Earnings and Medical/Personal/Household Related Expenses

Defendants assert that the jury's award for past and future lost wages, and the award for all future medical and other personal and household expenses, should be set aside as not proven with reasonable certainty, and as excessive under § 5501(c). The Court finds these arguments unpersuasive.

Damages awards for loss of earnings are subject to the "deviates materially from reasonable compensation" standard of § 5501(c), as are awards for future medical expenses. *See*

50

Butts v. Braun, 204 A.D.2d 1069, 612 N.Y.S.2d 520 (4th Dep't 1994). "A jury may award damages both for actual past losses as well as for reasonably certain future losses, taking into account plaintiff's age, health conditions, life expectancy, work-life expectancy, and other such factors." Kane v. U.S., 189 F. Supp. 2d 40, 52-53 (S.D.N.Y. 2002) (citing N.Y. Pattern Civ. Jury Instr. 2:280, 2:280.1, 2:285, 2:290, 2:301).

The jury awarded Mr. Okraynets $129,150 in past lost wages, $498,376 in past medical expenses (stipulated to by the parties), $5,261,135 in future lost wages, and a total of $9,550,000 in future lost medical, personal, and household related expenses. Given Mr. Welsch's testimony, the evidence upon which he relied, and the reasonable assumptions he made, I cannot say that the jury's awards for lost earnings and future medical, personal, and household expenses were not proven with reasonable certainty or deviate materially from what would be reasonable compensation. *Cf.* Tassone, 5 A.D.3d at 932-33; Butts, 204 A.D.2d at 1069-70.

### A.    Past and Future Lost Wages

"The basic rule is that loss of earnings must be established with reasonable certainty, focusing, in part, on the plaintiff's earning capacity both before and after the accident. Recovery is allowed not only for actual lost wages, but for any diminution in future earning capacity." Johnston v. Colvin, 145 A.D.2d 846, 848-49, 535 N.Y.S.2d 833, 835-36 (3rd Dep't 1988) (citations omitted). The jury heard competing testimony from Mr. Welsch and Dr. Goldman regarding plaintiff's future lost earnings. Both experts employed reasonable, albeit different, assumptions about such issues as work life expectancy, hours worked per year, and growth rate. The jury's award to Mr. Okraynets for past and future loss of earnings reflects the fact that the

jury was persuaded more by Mr. Welsch's opinion than by Dr. Goldman's. The amount of the

jury's award was established with reasonable certainty and did not deviate materially from

reasonable compensation.

According to actuarial tables, Mr. Okraynets could be expected to work until he reached

the age of 61. (*See* Tr. 677.) Mr. Welsch based his projections for loss of future wages on the

assumption that, had he not been injured, Mr. Okraynets would have continued working until age

59 (i.e., approximately 29 more years). Dr. Goldman estimated that Mr. Okraynets would have

worked 24.8 additional years, factoring in such possibilities as other injuries, periods of

unemployment, etcetera. Mr. Welsch's decision to use the higher number was not unreasonable.

(*See* Tr. 720.) That number is an actuarial "average." It is certainly possible that Mr. Okraynets

could have continued working until he was, say, 65 years old.

As for the number of hours worked per year, Mr. Welsch based his projections on Mr.

Okraynets' past job performance, prior to the accident, which demonstrated that plaintiff worked

an "above average" number of hours. (*See* Tr. 719.) One reason Mr. Welsch based his

calculations on Mr. Okraynets' past years' earnings was so that overtime would be taken into

account. *Cf.* Johnston, 145 A.D.2d at 848-49 (stating rule that plaintiff's earning capacity prior to

the accident should be considered). Dr. Goldman, on the other hand, used historical hours

figures for the average worker, which were considerably lower than Mr. Okraynets' hours

worked per year. In other words, Dr. Goldman assumed that Mr. Okraynets would have been an

"average" worker had he not been injured, even though his past performance indicated otherwise.

(*See* Tr. 735.) Dr. Goldman agreed, however, that "blending" job title, hours of straight time,

52

and hours of overtime, based upon actual earnings, is an acceptable way to estimate wages. (Tr. 734-35.)

Defendants argue that Mr. Welsch's estimates were "fatally flawed" because, among other reasons, they were based on the assumption that plaintiff would continue to work as hard as he had worked the year before the accident, rather than the number of hours the average carpenter worked, as reported by union actuaries. However, evidence at trial revealed that Mr. Okraynets was historically an above-average worker, and it was not unreasonable for the jury to believe that plaintiff would continue to perform as an above-average carpenter in the future.

The wage growth rates used by Mr. Welsch and Dr. Goldman also differed. Mr. Welsch used a growth rate of 4.15 percent, compared to Dr. Goldman's rate of 3.3 percent. (*See* Tr. 211, 292, 676, 732, 743.) Mr. Welsch's slightly higher growth rate was not unreasonable or excessive; Dr. Goldman admitted that different economists can disagree with each other about assumptions used in forecasting. (Tr. 755-56.)

These different assumptions used by these two experts – 24.8 years work life expectancy vs. 29 years, average vs. above-average number of hours worked per year, and 3.3 percent vs. 4.15 percent growth rate – help explain why Dr. Goldman estimated plaintiff's future lost wages to be $2,149,130, while Mr. Welsch estimated them to be $4,993,068. (*See* Tr. 682; PX 47.)

I am not persuaded by defendants' contentions that the jury's award for future lost earnings was not proven with reasonable certainty or that it deviates materially from reasonable compensation. Therefore, I decline to remit that award.

Defendants do not seriously dispute the jury's award for past lost wages.

## B.    Future Medical/Personal/Household Related Expenses

The jury also heard competing expert testimony about what Mr. Okraynets would need by
way of a life care plan from plaintiffs' expert Dr. Richard Schuster and from defendants' expert
Dr. Beth Greenbaum. These experts, too, based their opinions on reasonable assumptions.
Based on Dr. Schuster's opinions, Mr. Welsch estimated that Mr. Okraynets' life care to age 77
would cost approximately $13 million. (*See, e.g.*, PX 47; Tr. 288, 808.) Based on Dr.
Greenbaum's opinions, Dr. Goldman estimated that plaintiff's life care to age 67.5 would cost
approximately $4.3 million. (*See, e.g.*, Tr. 683-91, 825; DX 47.) The jury awarded $9,550,000
for Mr. Okraynets' future medical, personal, and household-related expenses, which falls in
between the projections of the two experts. It is substantially less than the amount plaintiff
sought. (*See* PX 47.)

Defendants advanced no compelling arguments in their post-trial memoranda as to why
this award was not proven with reasonable certainty, or why it deviates materially from
reasonable compensation. The party challenging the jury's award bears the burden of convincing
the court that the award lies "beyond the pale of non-material deviation." Geressy v. Digital
Equip. Corp., 980 F. Supp. 640, 660 (E.D.N.Y. 1997). Defendants have not sustained their
burden with regard to the jury's award for future medical, personal, and household-related
expenses. Their post-trial argument on this point is relegated to one paragraph, and it does not
cite the record or explain why the projections for plaintiff's future needs are not supported by the

evidence and the testimony of Dr. Fried, Dr. Schuster, and Mr. Welsch. Defendants do not

challenge Dr. Schuster's cost assumptions or Mr. Welsch's calculations.

Although the "deviates materially" standard of § 5501(c) applies to future economic

damages as well as pain and suffering, s*ee, e.g.*, Tassone, 5 A.D.3d at 932-33, Walsh, 232

A.D.2d at 941, a trial court's review of jury awards for economic damages entails different

considerations than its review of awards for pain and suffering. This is because what is

"reasonable compensation" for economic damages – such as lost wages and future medical

expenses – is based on calculations, assumptions, and tangible information, whereas awards for

pain and suffering are based on a jury's subjective determination of the value placed on a

person's pain and suffering. "With economic damages, the court may rely on traditional methods

of economic analysis" in reviewing jury awards under § 5501(c)'s "conception of reasonable

compensation." Geressy, 980 F. Supp. at 656.

The New York Court of Appeals has commented on the distinction between economic

losses, which can be proven with some precision, and non-economic losses, which cannot:

> [R]ecovery for noneconomic losses such as pain and suffering and
> loss of enjoyment of life rests on 'the legal fiction that money
> damages can compensate for a victim's injury.' We accept this
> fiction, knowing that although money will neither ease the pain nor
> restore the victim's abilities, this device is as close as the law can
> come in its effort to right the wrong. We have no hope of
> evaluating what has been lost, but a monetary award may provide a
> measure of solace for the condition created.

McDougald v. Garber, 73 N.Y.2d 246, 254, 536 N.E.2d 372, 374-75 (1989) (citation omitted).

It is for the reasons described above that comparing awards in other cases, though useful in examining an award for economic loss, does not quite serve the same purpose of consistency and predictability as it does with awards for pain and suffering. When it comes to future medical needs and household-related expenses, every case is different.

Nevertheless, even comparing Mr. Okraynets' award for future medical and other expenses to awards in similar cases, it is clear that the jury's award to Mr. Okraynets does not deviate materially from reasonable compensation. In Miraglia, for example, the jury awarded the 45-year-old paraplegic plaintiff $8,295,000 for future medical expenses, which was reduced to $8,056,222 only because the award improperly included an amount for lost earnings which was the subject of a separate award. *See* Miraglia, 36 A.D.3d at 456-57. The Appellate Division noted that the proper amount plaintiff should receive for future medical expenses was "the maximum amount supported by the evidence." Id. at 457. Given the award in Miraglia, the jury's award of $9,550,000 to Mr. Okraynets for future medical, personal, and other expenses does not deviate materially from reasonable compensation, particularly in light of the fact that the award in Miraglia was intended to compensate a plaintiff with a shorter life expectancy than Mr. Okraynets (35 years versus 39 years). *See* id. at 456-57.

I have no reason to set aside this award or conditionally order a new trial on this issue subject to remittitur. The jury's award of $498,376 for past medical expenses, having been stipulated to by the parties, also remains undisturbed.

56

## V.    Collateral Source Hearing

The form of a final judgment in diversity jurisdiction personal injury cases is considered

substantive law for Erie purposes, governed by the structured judgment provisions of N.Y.

C.P.L.R. §§ 5041-5049 ("Article 50-B"). *See* Gravatt v. City of New York, 54 F. Supp. 2d 233,

233-35 (S.D.N.Y. 1999). Plaintiffs do not dispute that the judgment to be entered in this case

will be "structured" under C.P.L.R. Article 50-B.

In calculating the structured judgment, "The court shall apply to the findings of past and

future damages any applicable rules of law, including set-offs . . . ." C.P.L.R. § 5041(a).

Section 4545(c) provides:

> In any action brought to recover damages for personal injury, . . .
> where the plaintiff seeks to recover for the cost of medical care,
> dental care, custodial care or rehabilitation services, loss of
> earnings or other economic loss, evidence shall be admissible for
> consideration by the court to establish that any such past or future
> cost or expense was or will, with reasonable certainty, be replaced
> or indemnified, in whole or in part, from any collateral source such
> as insurance (except for life insurance), social security (except
> those benefits provided under title XVIII of the social security act),
> worker's compensation or employee benefit programs (except such
> collateral sources entitled by law to liens against any recovery of
> the plaintiff). If the court finds that any such cost or expense was
> or will, with reasonable certainty, be replaced or indemnified from
> any collateral source, it shall reduce the amount of the award by
> such finding . . . .

The evidence before me indicates that substantial collateral source set-offs might exist in

this case. For example, Social Security Disability ("SSD") payments are a collateral source

under § 4545(c). *See, e.g.*, Turnbull v. USAir, Inc., 133 F.3d 184, 187, 189 (2d Cir. 1998);

Bryant v. New York City Health & Hosps. Corp., 93 N.Y.2d 592, 609, 695 N.Y.S.2d 39 (1999).

At his deposition, Mr. Okraynets testified that he is currently receiving approximately $1200 per month in social security disability benefits. (*See* Dkt #65, D'Avanzo Decl. Ex. D, at 121.) Plaintiff also currently receives Worker's Compensation benefits. Plaintiff agrees that defendants are entitled to collateral source set-off for all SSD payments made to date and for the value of future payments.

Medical coverage is another collateral source issue. *See, e.g.*, Turnbull, 133 F.3d at 187-88. Plaintiff receives free medical coverage through his union until February 2009; at that point, he will be eligible for Medicare, and union insurance will cover non-Medicare expenses, such as medication expenses. (*See* Dkt. #65, D'Avanzo Decl. Ex E; Dkt. #58, Pls.' Opp. at 6 n.1 (noting that collateral source issues under C.P.L.R. § 4545 are "typically addressed at a post-verdict hearing").) The union coverage qualifies as a collateral source set-off too.

Pursuant to § 4545, the set-off must be determined before entry of final judgment, the award must be reduced by the amount of the set-off for collateral source payments, and this reduction must be reflected in the structured judgment. No agreement has been reached on the amount of social security set-off, and in his post-trial motion, plaintiff claims no set-off for medical payments, arguing that it constitutes a lien to be repaid. (*See* Dkt. #70, Pls.' Opp. at 24 (citing Kelly v. State Ins. Fund, 60 N.Y.2d 131, 456 N.E.2d 791 (1983), and Manning v. Utils. Mut. Ins. Co., 254 F.3d 387 (2d Cir. 2001).) Plaintiff's post-trial arguments about what Medicare will and will not cover, and whether defendants are entitled to a set-off, further confirms that a hearing must be held.

58

At trial, I stated that the collateral source issues would be addressed at a post-verdict hearing. (*See* 3/4/08 Tr. at 89.) And I said that it would go to the Magistrate Judge. Both parties, at that time, agreed that such a hearing should occur. (Id. at 89-90.) The collateral source issues will not be decided based on the limited information provided to me in post-trial memoranda, or on the basis of an informal opinion issued by a state agency, attached to a letter submitted by plaintiff after the post-trial motions had been briefed fully. (*See* 4/23/08 Letter to the Court from B. Sacks.) Accordingly, the Court is ordering a hearing before the Honorable Magistrate Judge Henry B. Pitman to determine the set-off amounts unless the parties can agree on these amounts and on the form of the judgment within thirty days from this decision. (*See* 3/4/08 Tr. at 89.) As such, plaintiff's request for oral argument on whether a hearing is required is DENIED.

## CONCLUSION

For the foregoing reasons, the decision and order of the Court is as follows:

Defendants' motion for a new trial on all damages based on the admission of testimony concerning Tatiana Okraynets' psychological therapy needs, the summation comments by plaintiffs' counsel, and the timing of the disclosures of Dr. Fried and Dr. Brosgol is DENIED;

Defendants' motion to set aside the jury's pain and suffering and loss of consortium awards as deviating materially from reasonable compensation, and to order a new trial on those issues, is GRANTED subject to plaintiffs' acceptance, in writing within thirty (30) days, of the remittitur amounts stated in this decision;

Defendants' motion to set aside and vacate the jury's award for past and future fringe benefits as not proven with reasonable certainty as a matter of law is DENIED as to past fringe benefits and GRANTED IN PART as to future fringe benefits, for which a new trial will be held unless plaintiffs agree within thirty (30) days to the remittitur amount stated in this decision;

Defendants' motion to set aside the jury's award for past and future lost wages and all future medical and other personal and household expenses as not proven with reasonable certainty and as deviating materially from reasonable compensation, and to order a new trial on those issues, is DENIED;

Defendants' request for a hearing for purposes of calculating collateral sources set-offs and other judgment structuring issues is GRANTED unless the parties can agree on those issues within thirty (30) days of this decision. The Court's remittitur of the pain and suffering and loss of consortium awards does not affect the collateral source issues with regard to social security disability benefits, worker's compensation benefits, and medical coverage.

Within thirty (30) days of this decision, plaintiffs may file with the Clerk of the Court a written acceptance of the remittiturs of the aggregate pain and suffering award, the aggregate loss of services and society award, and/or the loss of future fringe benefits award. The total award, if plaintiffs agree to these remittiturs, will be reduced from $44,706,444 to $30,471,710. If plaintiffs do not agree to the reductions of these awards as stated in this decision, I will schedule a new trial solely on those damages issues for which remittitur was not accepted.

60

So ordered.

Dated: May 21, 2008

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

61